FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

2017 DEC 13 AM 10: 27

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

Louis J. Holtz, an individual, and Louis J. Holtz,
Inc., a Florida corporation,

       Plaintiffs,

vs.

The Daily Beast Company, LLC, a New York
limited liability company; IAC/InterActiveCorp.,
a New York corporation;  The YGS Group, Inc.,
a Pennsylvania corporation; and Betsy Woodruff,
an individual,

       Defendants.

CIVIL ACTION NO.:

JUDGE: 6:17-cv-2136-ORL
31-TBS

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

    Plaintiffs, Louis J. Holtz ("Mr. Holtz" or "Coach Holtz"), an individual, and

Louis J. Holtz, Inc. (collectively "Plaintiffs"), residents of Orlando, Florida sue

Defendants, The Daily Beast Company, LLC, a New York limited liability

company ("Daily Beast'), IAC/InterActiveCorp., a New York corporation ("IAC"),

The YGS Group, Inc., a Pennsylvania corporation ("YGS"), and Betsy Woodruff

("Woodruff"), an individual (collectively "Defendants"), and allege as follows:

## **NATURE OF THE ACTION**

    1.    This is an action for defamation, defamation *per se*, defamation by

implication, trade libel, injurious falsehood, injunctive relief and violation of

Florida Deceptive and Unfair Trade Practices Act.

-1-

2.     This case arises out of the Defendants' intentional and malicious defamation of Mr. Holtz, and the misappropriation of the rights and interests of Mr. Holtz, which the Defendants exploited for their own financial gain without permission or payment.

## THE PARTIES

3.     Mr. Holtz is an individual who resides in Orlando, Florida and conducts his business from offices located in Orlando, Florida.  Mr. Holtz is in the business of public speaking, television, and sports.

4.     Louis J. Holtz, Inc. is a Florida corporation which Mr. Holtz utilizes to conduct business, with its principal place of business in Orlando, Florida.

5.     IAC is one the nation's largest media companies, is publicly traded, and owns and operates numerous media outlets, including the Daily Beast and YGS which conduct business in the State of Florida, specifically publishing and directing their products and communications to residents of Florida.  IAC is a foreign corporation registered to do business in Florida.

6.     Upon information and belief, IAC, directly or through a subsidiary owns the fictitious name and trademark "Daily Beast" and owns all of the Daily Beast's and YGS's assets.

7.     IAC has been or is also the general manager of and owns or owned, controls or controlled, and conducts or conducted business in Florida by and through the Daily Beast, YGS and Woodruff in Florida.

8.     The Daily Beast and YGS are owned and operated by IAC which has a registered agent in Florida.

9.     Upon information and belief, Woodruff, is a reporter for the Daily Beast, a resident of Washington D.C., published the article which defamed Mr. Holtz in Florida and is employed by, and supervised and directed by, the Daily Beast, YGS and IAC.

10.     The popularity and profitability of the Daily Beast is largely derived from marketing edgy and controversial material. The Dailybeast.com statement of its "Code of Ethics and Standards" proudly states that "The Daily Beast is dedicated to independent journalism, pursued without fear or favor" and that "A core part of our mission is to confront bullies, bigots and hypocrites." The "code" goes on to state that "Factual errors require correction and acknowledgment by an editor at the end of the story."

11.     Woodruff is described on thedailybeast.com as she "is a political reporter for the Daily Beast…" and that "you can follow her on Twitter @woodruffbets."      Her       email       address       is       listed       as betsy.woodruff@thedailybeast.com.

12.    The Defendants operate the following websites and Twitter accounts which are published in, and directed to, the state of Florida:

      a)    thedailybeast.com;

      b)    dailybeastfacebook.com;

      c)    YGS.com;

      d)    @woodruffbets, with an estimated 56,800 followers; and

      e)    @thedailybeast, with an estimated one million followers.

13.    Plaintiffs allege that for purposes of the claims and allegations herein, IAC, the Daily Beast, YGS, Woodruff and their affiliates, not all of whom are known at this time, are, and all times material hereto, were principals and agents of one another, the alter-egos of each other, with a unity of interest and ownership among them and their subsidiaries and affiliates such that any separateness has ceased to exist.  For purposes of the claims and allegations herein, IAC, the Daily Beast, YGS, Woodruff and their affiliates used the assets of the other for its/their separate, individual purposes; transferred valuable assets, property rights and/or interests to each other without adequate consideration; share common ownership; have financial dependency upon each other; have significant control over each other's marketing, finances, and policies; share and/or file joint financial statements; and have interrelated activities such that any purported corporate separation is merely formal and technical. Consequently, for purposes of the claims

and allegations herein, IAC, the Daily Beast, YGS, Woodruff and their affiliates bear joint and several liability for the wrongful acts of one another, and are vicariously liable for the wrongful actions of their employees, agents and subsidiaries as alleged herein.

### Jurisdiction and Venue

14.    This Court has jurisdiction because this Complaint seeks damages in excess of $ 75,000.00.

15.    The issue in controversy involves a dispute between parties who are residents of different states of the United States.

16.    Venue is proper before in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiffs reside in, or transact business in, this district and the events and wrongful actions giving rise to the claims occurred in, and were directed to Plaintiffs residing in, this district.

17.    Defendants' acts and electronic communications into Florida were expressly aimed at Plaintiffs in Florida, knew that their actions would cause harm because Plaintiffs live and work in Florida, and Defendants entered into the State of Florida to commit the tortious acts complained of herein, including injuring Plaintiffs' business, reputation and occupation.

18.    Defendants' internet postings in the state of Florida constitute continuous, systematic and substantial general business contacts, and the material

posted by Defendants was accessible and accessed in Florida by Plaintiffs and others, subjecting Defendants to jurisdiction pursuant to Fla. Stat. § 48.193(1)(2). Defendants regularly use reporters in Florida, author and publish articles that are aimed at a Florida audience, and Defendants derive revenues from Florida-based advertising clients.

19.     Defendants purposely availed themselves of the privilege of conducting activities in Florida, should have known or reasonably anticipated that their repeated defamatory statements published in Florida would harm Plaintiffs in Florida and could subject Defendants to litigation in this Court's jurisdiction. Defendants should have reasonably anticipated being hailed into court in the state of Florida.

## General Allegations

20.     Coach Holtz is acknowledged to be one of the most well-known and beloved coaches in American history.

21.     Mr. Holtz is a nationally recognized motivational speaker, football coach, and sports analyst. Mr. Holtz was formerly a football coach of many major universities including the University of Notre Dame and the University of South Carolina. Mr. Holtz has been given honorary degrees from the University of Notre Dame, the University of South Carolina, Trine University and the Franciscan University of Steubenville. Mr. Holtz has been inducted in the Cotton Bowl Hall of

Fame and was elected to the Arkansas Sports Hall of Fame and the Upper Ohio Valley Hall of Fame. Mr. Holtz is without question one of the best known commentators on college football in the country. Mr. Holtz currently derives the majority of his income through speaking engagements. Mr. Holtz has an agent, who is responsible for securing speaking engagements for Mr. Holtz throughout the country and in the state of Florida.

22.    Defendants began a public assault on Mr. Holtz and his public speaking business during the last presidential campaign in the spring of 2016. The articles were clearly antagonistic to Mr. Holtz and malicious, rather than journalistic or mere expressions of opinion. These articles, when considered with the false and defamatory articles that would follow, constitute express malice, ill will, hostility and an evil intention to defame and injure:

-"Lou Holtz Backs Trump, Gave to Hillary" (Daily Beast, May 2, 2016)

-"Shouty Old White Coaches Heart Donald Trump" (Daily Beast, Jack Moore, May 3, 2016)

23.    On July 19, 2016, Mr. Holtz was invited by Phyllis Schlafly's Eagle Trust Fund to speak at a luncheon event at the Republican National Convention in Cleveland, Ohio. The purpose of the speech was to support the "small group of dedicated pro-life individuals gathered to fight for the lives of unborn babies, and they gave the dignity of life a new home." Mr. Holtz delivered the speech and

during the course of the speech, Mr. Holtz delivered a message that is characteristic of his style of speaking. Mr. Holtz gave interesting personal stories, entertained the guests with jokes, and ultimately voiced his personal opposition to abortion, as was the stated intent of the speech, while making positive and unifying statements about all people. Mr. Holtz stated, "I love President Obama as a father, as a husband, as a role model. You cannot deny that. He's done it with class"; and "That's what we need in this country. We need this country to understand other people and to care about them."

24. During the speech, Mr. Holtz spoke about the challenges of being born in the depression with little resources. Mr. Holtz talked about how his parents had received no more than a third grade education. And, Mr. Holtz talked about how his family lived in a small apartment in a cellar for 7 ½ years. Mr. Holtz talked about how proud he was to be born in the United States. Significantly, Mr. Holtz spoke about how he had many opportunities available to him here in the United States that he might not have in other places. Mr. Holtz talked about how he learned that if he could work hard, make good choices, and get an education, he would have many opportunities. During the course of his speech, Mr. Holtz stressed that young people should make good choices, do the right thing, stay in school, not do drugs, and not join gangs.

25.     During the speech, Mr. Holtz talked about his opposition to abortion. Mr. Holtz expressed his wish to save the lives of children who were innocent and could not speak for themselves.  The overwhelming majority of Mr. Holtz speech was related to abortion and the choices that an unborn child could not make. Mr. Holtz talked about how he and others should continue to speak for these unborn children who could not speak for themselves.

26.     At the very end of the speech, there was a brief discussion of immigration. During that time Mr. Holtz talked about his grandparents who immigrated to the United States from the Ukraine, and their entry through Ellis Island. Mr. Holtz talked about how his grandparents spoke Ukrainian and how Mr. Holtz tried to learn the language as a child. In the speech, when Mr. Holtz described how he asked his grandparents to teach him the Ukrainian language and his grandparents refused to do so. Instead, Mr. Holtz described how his grandparents told him that he did not live in Ukraine and that he only needed to learn how to speak English because he lived in the United States.

27.     During his speech, Mr. Holtz invited immigrants to come to the United States legally like his grandparents did and Mr. Holtz invited immigrants to assimilate like his family had assimilated. At the end of the immigration discussion, there was a joke made about soccer, a joke that you would expect to hear from a lifelong football fan, football coach, and football commentator.

28.    Mr. Holtz's grandparents were immigrants, who worked hard and could never be classified as "deadbeats". Mr. Holtz has the utmost respect for his grandparents and all immigrants who follow the law and find the American dream in this country. The substance or gist of Mr. Holtz's statements was not that all immigrants are "deadbeats."

29.    On July 19, 2016, Defendants published an article with the headline "Lou Holtz at RNC Said Immigrants are Deadbeats Invading the US." Internet references to the article are attached as Exhibit A. In the HTML source code, the term "deadbeats" was included more than 20 times for emphasis. This headline was completely false. Under no circumstance did Mr. Holtz ever make the headline statement. A review of the transcript from the speech reveals that there is clearly no such statement at any time and the implication of the headline was false and contrary to the gist of his actual message.

30.    On July 19, 2016, Defendants published in the article that Mr. Holtz claimed that incorrectly states the gist of Mr. Holtz's statements and Defendants' characterization creates a defamatory implication. During the course of the speech, Mr. Holtz stated what his grandmother told him, which was "you don't live in Ukraine, you live here, you learn to speak English. That's the only language you need to know." Mr. Holtz in fact stated "They come here. WELCOME." This calculated omission, like the false headline, misstates what the gist of what Mr.

Holtz stated in his speech and created a false impression by its use of the demeaning, inflammatory and pejorative word "deadbeat"- generally defined as a disreputable person who evades paying their debts.

31. The speech on July 19, 2016 related largely to the lives of the unborn and contained statements such as "We are here to speak for the unborn child"... "we are the voice for that unborn child that can't speak for itself"; "I think that we have an opportunity to serve the women of this country, by supporting them, by encouraging them, and by educating them, and that takes an awful lot of hard work"; and "Significant is when you help other people, particularly other people that can't help themselves."   These statements, like the one Mr. Holtz made complimenting President Obama, were omitted from the article.   Defendants' article juxtaposed a series of facts and false statements so as to create a defamatory implication and insinuated that Mr. Holtz' speech was mean spirited and related to bashing immigrants. This is not accurate.

32. There are imbedded in the article additional offensive defamatory statements about Mr. Holtz. First, the web address for the article that Defendants published on July 19, 2016 includes the following statement "Lou – Holtz –Goes – On – Immigrant – Bashing – Rant." This is not a mere opinion, but a false statement of what happened during Mr. Holtz's speech. Mr. Holtz did not go on an "immigrant bashing rant." Second, the source code of the web page is embedded

with 20 references to the word "deadbeat". This resulted in more harm to Mr. Holtz since it linked Mr. Holtz's name to this defamatory statement when third parties search out Mr. Holtz for business purposes. Furthermore, when one moves their cursor over Mr. Holtz face on Mr. Charles Luzier's photograph in the article the term "170719-lou-holtz-cheat" materializes. This is direct evidence of the malicious intent with which Defendants published this article.

33.     Defendants' website states that "the Daily Beast now reaches over 26 million readers per month", and these readers could access the article and the weblogs which contained defamatory statements designed to expose Mr. Holtz to public contempt, hatred, ridicule and disgrace and injure Mr. Holtz in his business, occupation, and in the community.

34.     The individual statements contained in the posts, when taken as a whole, inculpate Mr. Holtz and his company with moral turpitude and charge Mr. Holtz with unfitness and lack of integrity in the performance of his businesses.

35.     Defendants authored and published statements knowing they were false, or were defamatory by implication, and were made with reckless regard to their truth, created a false impression and were made with the intent to harm Plaintiffs' business reputation.

36.     Defendants utilized electronic communications to publish the defamatory article in the state of Florida for the purposes of maliciously damaging

Mr. Holtz for sensational reasons and their own profit. Defendants intended that the story they published about Mr. Holtz would likely be republished and retweeted by their tens of thousands of followers, including in the state of Florida. In fact, Defendants routinely use the republication opportunities for marketing of publication and articles.

37.    After Defendants published these false statements, many other news outlets republished the comments, and specifically the false "deadbeats" statement, including in the state of Florida. For example, the website awfulannouncing.com republished Defendants' article in its entirety which was directed to, accessible in, and accessed in, the state of Florida. And, the New York Daily News also republished Defendants' statements. Defendants' comments and characterization of the speech were published in the Washington Post, LA Times, Sports Illustrated, and many other national and local publications which were published in the state of Florida.

38.    Mr. Holtz's representatives contacted Defendants to attempt to resolve this dispute amicably. Mr. Holtz wrote a letter to the editor in chief, Mr. John Avlon, on August 15, 2016, but Mr. Avlon never responded. Instead, an attorney for the Daily Beast emailed Mr. Holtz's attorney on September 12, 2016 that he was "investigating the matter" and would "get back as soon as . . . in a position to do so." Mr. Holtz then followed up on September 20, 2016 and a representative of

Defendants emailed stating he hoped "to be in a position to get back to [Mr. Holtz] soon." On October 4, 2016, Mr. Holtz contacted Defendants again demanding a retraction and had his attorneys send a letter on October 6, 2016. Defendants' representative responded on October 11, 2016 that they apologized for "taking so long to respond", and that "The Daily Beast has decided to remove the word "deadbeats" from the headline in question. The headline was updated in this way on October 7, and a note was placed under the headline describing the change and the nature of the mistake, stating that Mr. Holtz did not call immigrants "deadbeats" and expressing sincere regrets for this error." The email further stated that "The Daily Beast apologizes to Mr. Holtz for this error and is happy to correct it."

39.    The updated article continued to bear the false and malicious headline "Holtz Goes on Immigrant –Bashing RNC Rant", followed by a photo and an introductory paragraph before this statement is made: "UPDATE 10/7/16: The headline on this story has changed. The original headline conflated two points that Mr. Holtz made in his speech- the need for immigrants to learn English, and the group of Americans, whom Mitt Romney in 2012 infamously labeled the "47%," who, Holtz stated, make their living by the way they vote. But Holtz did not say that immigrants are "deadbeats", and we sincerely regret this error."

40.     Thus, almost three months passed while the malicious, false and damaging statement remained published in the public eye and accessible in Florida on the internet.   Notably, Woodruff, the author of the false and defamatory statement, never apologized and went silent notwithstanding that Mr. Holtz's attorneys' letter was also addressed to her.   Woodruff has over 56,000 Twitter followers, including in the state of Florida, but did not state that she was mistaken in her "quote" of Mr. Holtz on her Twitter account.

41.     On August 24, 2016, the Defendants caused even more damage by publishing, including in Florida, another article directed to Plaintiffs' commercial interests entitled "Texas HS to Rescind Lou Holtz Speaking Invite", an article authored by "Bye Trumpkin", and stated the reason for the cancellation as "because of his recent comments about immigrants" and stated that another paper, picking up on Defendants' theme, stated that Mr. Holtz had "lobbed hate filled rhetoric at immigrants."   This article made no effort to clarify that the "recent comments" did NOT include that the false statement that immigrants were deadbeat, nor that the Daily Beast had retracted the deadbeats headline and apologized.

42.     Many other notable news outlets piled on and parroted Defendants' words and theme literally or their gist:

-"...the Daily Beast reported that Holtz...unleashed a random tirade about immigrants..." New York Daily News (nydailynews.com);

-"Trump-Supporting Football Coach Denounces Immigrants in Racist Speech" ( Think Progress, July 20, 2016);

-"Notre Dame Must Distance Themselves from the Lou Holtz Brand" (thesportsbank.net);

-"Lou Holtz Getting Destroyed for Controversial Comments at GOP Convention"(fansided.com).

43.     Numerous news outlets with tens of thousands of readers republished and quoted Woodruff and the Daily Beast and published links to the original article - for example, USA Today and Washington Post articles on July 19, 2016, and sports outlets such as Bleacher Report, fansided.com, sportsonearth.com, Tallahassee.com, satanicapitalist.com (...Holtz Says Immigrants are Deadbeats...), soundcloud.com ("Lou Holtz at RNC Says Immigrants are Deadbeats..."), truecload552.weebly.com (" ...Immigrants are Deadbeats..."), memorandum.com ("Betsy Woodruff/The Daily Beast: Lou Holtz at RNC Says Immigrants Are Deadbeats Invading the U.S."), nymag.com ("Betsy Woodruff reports that the coach did not bother couching his beliefs about immigration..."), etc.    These articles are still being published and are accessible on the internet in Florida.

44.     Pursuant to §770.01 of the Florida Statues, before a civil action is brought for libel or slander, Mr. Holtz had his attorney serve notice in writing on Defendants specifying the article or broadcast and the statements therein which he alleged to be false and defamatory. A letter was provided to Defendants in accordance with §770.01 of the Florida Statues. The identity of the defamatory article and the specific statements were detailed in the letter:

> Defamatory Article: July 19, 2016, Betsy Woodruff, The Daily Beast, "Lou Holtz at RNC Says Immigrants Are Deadbeats Invading the US" published at http://www.thedailybeast.com/cheats/2016/07/19/lou-holtz-goes-on-immigrant-bashingrant-at-rnc.html?via=desktop&source=copyurl and all republication, which was reasonably foreseeable;

> False and Defamatory Statements: Holtz says immigrants are deadbeats; Holtz goes on immigrant bashing rant, Holtz's speech was related to immigration, Holtz said that immigrants needed to become us and speak English; Lou Holtz is a cheat.

45.     Among the damages incurred by Plaintiffs are damages that accrued from the loss or cancellation of speeches, including speeches in the state of Florida, and a loss of speaking fees after Plaintiffs and their agents were contacted to cancel scheduled appearances.   The cancellations damaged Plaintiffs' Florida business interests, as well as caused mental anguish and suffering, personal humiliation and distress from the barrage of hurtful, embarrassing and menacing statements.  For example,    headlines    such    as    "Lou    Holtz    getting    destroyed    for comments…"(fansided.com), Lou Holtz Under Fire…"(complex.com),  and twitter

comments on Woodruff's Twitter account incited by Woodruff - "fascist," "xenophobic racist", "bigot", "senile", "drunk", "awful person." "racist bastard," etc.    Woodruff's tweets were accessible and accessed in Florida, her Twitter followers include residents of Florida and some retweeted Woodruff's article. Exhibit B, Excerpts from Woodruff's Twitter account.

46.    Woodruff had ample opportunity to fact check her false headline before publishing them to the world.    A Woodruff Twitter follower asked her BEFORE Defendants published the story, "are you planning to publish a story on Holtz's speech?", to which Woodruff answered, "yes indeed," to which her follower responded "I'm on standby, will link."    Other twitter followers questioned her on the accuracy of her reporting and the gist of Mr. Holtz's intent - "did he really say that Betsy?"; and  "obviously a jesting comment...." Woodruff had time to reflect, or edit her story to include the positive statements Mr. Holtz made about immigrants, helping women and President Obama, and Woodruff had time to ensure that her statements were not incomplete, misleading or created a false impression.    Woodruff's and Defendants' failure to do so evidences actual and express malice, ill will and hostility with an intention to injure.

47.    After Defendants published the false statements, and on the same day, other Woodruff Twitter followers continued to question Woodruff's accuracy: "true? Citation?", to which Washington post reporter Mike Madden replied, "It

doesn't need a citation, she's attending a speech he's giving."   Other followers asked, "did he really say that?" But Defendants did not make a full and fair correction of the false statements, make an apology or issue a retraction, for the statements which were published or broadcast in Florida.

48.    Plaintiffs further allege that discovery may reveal whether other Defendants should be added by amendment to this Complaint.

49.    Defendants posted the false statements and implications to lure advertisers to advertise on their sites so as to obtain income.

50.    In addition to being damaged personally by defamation, Mr. Holtz's business of exploiting his valuable publicity rights has been damaged and exploited by Defendants. Beginning in approximately 1975, Mr. Holtz created a good reputation, valuable publicity rights and a trade name.

51.    Mr. Holtz has at all material times hereto owned the real and personal estates and effects of "Coach Lou Holtz", including the exclusive right to exploit his publicity rights and to give consent to any license of such.

52.    For Defendants' own profit and advantage Defendants have misappropriated Plaintiffs' publicity rights without consent or payment.

53.    Defendants' misappropriation of Plaintiff's publicity rights has enhanced Defendants' readership and market recognition, and Defendants have profited from the exploitation of Plaintiffs.

54.   In addition, Defendants' actions, statements and implications are highly offensive to a reasonable person to an important, substantial and respectable part of the community, have damaged Plaintiffs' reputation and the ability to obtain work. Defendants' publication in Florida was made accessible to members of the community in a manner which makes it proper to assume it would have reached them, including those with which Plaintiffs had personal, social, official or business relations.

55.   Upon information and belief, Plaintiffs allege that as a direct and proximate cause of Defendants' wrongful conduct, Defendants have realized and continue to realize benefits rightfully belonging to Plaintiffs.

56.   As a result of Defendants' actions for the purpose of commercial advantage, disparagement or private financial gain, Plaintiffs were forced to retain the law firm of Morgan & Morgan, P.A., agreeing to pay reasonable attorneys' fees for its legal services and costs.

57.   All conditions precedent to the commencement and prosecution of this action and the granting of the relief requested have been performed, satisfied, excused or waived.

## COUNT I
## DEFAMATION

58.   This is an action in equity for damages in excess of $75,000.00.

59.     Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through 57, above.

60.     Defendants made false statements regarding Mr. Holtz in the performance of his businesses.

61.     Defendants published the statements directed to the state of Florida and to the general public via the world-wide internet.

62.     Defendants' publication of the false and injurious statements were not subject to any available publication or legal privilege.

63.     Defendants' false and injurious statements exposed Plaintiffs to distrust, hatred, contempt, ridicule and/or obloquy.

64.     Defendants' false and injurious statements have the tendency to, and did, in fact, injure Plaintiffs' reputation and business.

65.     Defendants' false and defamatory statements harmed Plaintiffs' reputation so as to lower Plaintiffs in the estimation of the community and to deter third persons from associating or dealing with Plaintiffs.

66.     As a result of Defendants' actions, Plaintiffs have been damaged.

67.     Defendants' statements were made in bad faith, with knowledge of their falsity or reckless disregard of the truth or falsity of the statements, and were not an honest mistake of facts.

68.     Defendants made their false statements with actual malice toward Mr. Holtz with the specific intent to damage and harm Plaintiffs and their profession.

69.     As a result of Defendants' actions, Plaintiffs have been harmed.

WHEREFORE, Plaintiffs demand judgment for compensatory and consequential damages, damages for emotional distress and personal humiliation, including exemplary and punitive damages, together with prejudgment interest thereon, and all interest and costs due under Florida law against Defendants, and such other relief as the Court deems fair and reasonable.

## COUNT II
## DEFAMATION PER SE

70.     This is an action in equity for damages in excess of $75,000.00.

71.     Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through 57, above.

72.     Defendants made the false statements about Mr. Holtz which are *per se* injurious as they accuse Mr. Holtz of behavior inconsistent with his profession.

73.     The nature of the false statements are such that malice and actual damage are presumed because Defendants imputed to Mr. Holtz characteristics or a condition incompatible with the exercise of Mr. Holtz's lawful trade and profession.

74.     Defendants published the false statements to third parties via posting the statements on the world-wide internet and directed to the state of Florida.

75.     The falsity of these statements injured Plaintiffs' reputation in the business community.

76.     As a result of these false statements, Plaintiffs have suffered damage.

WHEREFORE, Plaintiffs demand judgment for compensatory and consequential damages, damages for emotional distress and personal humiliation, including exemplary and punitive damages, together with prejudgment interest thereon, and all interest and costs due under Florida law against Defendants, and such other relief as the Court deems fair and reasonable.

## COUNT III
## DEFAMATION BY IMPLICATION

77.     This is an action in equity for damages in excess of $75,000.00.

78.     Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through 57, above.

79.     Defendants made false statements, or statements which when juxtaposed with other statements, facts or omissions created a false impression, regarding Mr. Holtz, and regarding Plaintiffs in the performance of their business.

80.     Defendants published the statements directed to the state of Florida and to the general public via the world-wide internet, which was accessible to and accessed by Plaintiffs and others in Florida.

81.     Defendants' publication of the false and injurious statements were not subject to any available publication or legal privilege.

82.   Defendants' false and injurious statements exposed Plaintiffs to distrust, hatred, contempt, ridicule and/or obloquy.

83.   Defendants' false and injurious statements have the tendency to, and did, in fact, injure Plaintiffs' reputation and business.

84.   Defendants' false and defamatory statements harmed Plaintiffs' reputation so as to lower Plaintiffs in the estimation of the community and to deter third persons from associating or dealing with Plaintiffs.

85.   As a result of Defendants' actions, Plaintiffs have been damaged.

86.   Defendants' statements were made in bad faith, with knowledge of their falsity or reckless disregard of the truth or falsity of the statements, and were not an honest mistake of facts.

87.   Defendants made their false statements with actual malice toward Plaintiffs with the specific intent to damage and harm Plaintiffs and their profession.

88.   As a result of Defendants' actions, Plaintiffs have been harmed.

WHEREFORE, Plaintiffs demand judgment for compensatory and consequential damages, damages for emotional distress and personal humiliation, including exemplary and punitive damages, together with prejudgment interest thereon, and all interest and costs due under Florida law against Defendants, and such other relief as the Court deems fair and reasonable

## COUNT IV
## INJURIOUS FALSEHOOD – TRADE LIBEL

89.　This is an action in equity for damages in excess of $75,000.00.

90.　Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through 57, above.

91.　Defendants made false statements about Mr. Holtz's businesses and disparaged the nature and manner in which the Plaintiffs conduct business.

92.　Defendants published the untrue statements to third parties through posting the statements over the world-wide internet.

93.　Defendants knew that the false statements were likely to influence prospective users of Plaintiffs' businesses to avoid Plaintiffs businesses.

94.　The false statements materially and substantially induced third parties not to utilize Plaintiffs businesses and not to contract with Plaintiffs.

95.　As a result of the Defendants publishing the false statements to third parties, Plaintiffs have suffered pecuniary loss in the form of lost business revenues and business contracts.

WHEREFORE, Plaintiffs demand judgment for compensatory and consequential damages, damages for emotional distress and personal humiliation, including exemplary and punitive damages, together with prejudgment interest thereon, and all interest and costs due under Florida law against Defendants, and such other relief as the Court deems fair and reasonable.

## COUNT V
## INJUNCTIVE RELIEF

96.     This is an action in equity for temporary and permanent injunctive relief.

97.     Plaintiff re-alleges and incorporates herein by reference Paragraphs 1 through 57, above.

98.     Based on the facts set forth herein, Plaintiffs have a substantial likelihood of success on the merits of the asserted causes of action.

99.     Plaintiffs do not have an adequate remedy of law.

100.    Monetary damages are inadequate to protect the present and future business interests and reputation of Plaintiffs.

101.    Injunctive relief would provide a benefit to, and is in the interests of, the public, as it would deter defamation, libel and other actionable conduct through the Internet.

WHEREFORE, Plaintiffs demand a temporary and permanent injunction against Defendants enjoining Defendants from hosting, posting, or in any manner publishing or disseminating any defamatory or injurious information relating to the Plaintiffs.

## COUNT VI
## VIOLATION OF FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT - §501.204 FLORIDA STATUTES

102. This is an action by Plaintiffs under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") §§ 501.201 et seq., Florida Statutes.

103. Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through 57, above.

104. FDUTPA renders unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" provided to consumers. See Section 501.204(1), Fla. Stat. (2017).

105. At all relevant times, Defendants advertised, solicited, provided, offered, and distributed goods and services by developing, owning, and operating web sites and news outlets for consumers and thus were engaged in "trade or commerce" as defined in § 501.203(8), Fla. Stat. (2017).

106. At all relevant times, Defendants advertised, solicited, provided, offered, and distributed news, stories, entertainment and services for consumers and thus were engaged in "trade or commerce" as defined in § 501.203(8), Fla. Stat. (2017).

107. At all relevant times, Defendants' unfair practices regarding the use, exploitation, commercial disparagement and trade libel of Plaintiffs' interests were immoral, unethical, oppressive, unscrupulous, substantially injurious to Plaintiffs.

108. Under FDUTPA, unconscionable, unfair, and deceptive acts or practices in the conduct of trade or commerce are unlawful. §501.204(1), Fla. Stat.

109. Anyone aggrieved by a violation of FDUTPA may bring an action for declaratory relief against the entity that has violated the act. § 501.211(1), Fla. Stat.

110. In any action by a party that has suffered a loss as a result of a violation of FDUTPA, such a person may recover actual damages, attorneys' fees, and court costs under § 501.211(2), Fla. Stat.

111. By publishing defamatory statements about Plaintiffs for a commercial or advertising purpose without Plaintiffs' consent, Defendants are engaging in business practices that are unconscionable, unfair, and deceptive because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Plaintiffs experienced Defendants' unconscionable, unfair, and deceptive business practices, which were committed in the conduct of commerce or trade.

112. As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

WHEREFORE, Plaintiffs demand judgment that Defendants be enjoined for any further publication. Further, Plaintiffs demand judgment against Defendants for compensatory and consequential damages, including exemplary damages, together with prejudgment interest thereon, and all interest and costs due under

Florida law, and such other relief as the Court deems fair and reasonable, including an award of Plaintiffs' attorneys' fees and costs.

## **RELIEF REQUESTED**

A.     Award Plaintiffs damages, both compensatory and punitive, against Defendants;

B.     Grant a permanent injunction against Defendants enjoining Defendants from hosting, posting, or in any manner publishing or disseminating, whether in their legal identity or under any aliases, whether now created or created in the future, any defamatory or injurious information relating to Plaintiffs;

C.     Order Defendants to remove from the Internet and any other media, of any kind or nature, all actionable statements posted or published against Plaintiffs;

D.     Award Plaintiffs fees and costs incurred with the prosecution of these actions; and

E.     Award Plaintiffs such other and further relief as this court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

Dated: December 12, 2017

Respectfully Submitted,

**Morgan & Morgan, P.A.**
Business Trial Group

-29-

*Attorneys for Plaintiff(s)*

By: *Clay M. Townsend*

Clay M. Townsend, Esq.
Florida Bar No. 363375
Keith R. Mitnik, Esq.
Florida Bar No. 436127
20 North Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone: (407) 418-2075
Facsimile: (407) 245-3346
ctownsend@forthepeople.com
kmitnik@forthepeople.com